(Cuyahoga County Probate Court.)

IN THE MATTER OF REV. ELMER W. REINHART.

———

(1). The persons entitled to receive licenses from the probate court authorizing them to solemnize marriages in the state of Ohio, are not alone "ministers of the gospel"—meaning Christian ministers—in the strict sense, notwithstanding the wording of section 6386, Revised Statutes. The expression "Any minister of the gospel," as used in that section, must be construed liberally, and in the light of section 6385, defining the officers who may solemnize marriages, and means any minister of religion of any religious society or congregation.

(2). The expression "regular ordained minister," as used in said section 6386, must not be construed with reference to any particular form of ordination.

(3). Ministerial Ordination in its legal signification, is viewed by courts in a double aspect: As investing with spiritual authority to preach the gospel or religious tenets of his order or society: and with reference to the right of exercising special ministerial functions, in a particular place, or according to some special regulation. (Kibbe v. Antram 4 Conn., 134.)

(4). A person who being a minister, regularly ordained, and having received a license under section 6386, who is cut off from membership in the congregation and society to which he ministers, and his relation and contract as minister is terminated by any action of the society or congregation, not absolutely void or unlawful, does not "continue a regular minister in such society, or congregation," in the sense and meaning of said section, and his license should be revoked.

Application to revoke Clergyman's License.

WHITE, P. J.

Elmer W. Reinhart received from this court on the 11th day of March, A. D. 1899, a license in due form, authorizing him to solemnize marriages in the state of Ohio. This license was granted and issued on his written application verified by his oath, which stated that he was an ordained minister of the Gospel according to the rules and regulations of the religious society, congregation or denomination known as the Disciples of Christ, or Christian Church, in November, 1895, at Norborne, in the state of Missouri.

That he was officiating as such minister at the church of said denomination, known as the Disciple Church, in Solon, Cuyahoga county, Ohio, and also produced to the judge of said court, a certificate of his ordination, signed by one Elder W. F. Richardson, of Kansas City, Mo., in ordinary form.

It is proper to say that in addition to the facts stated in the application, Mr. Reinhart stated and testified in substance that he was having some trouble with the Solon Disciple

Church; that the church had attempted to suspend him in his ministerial and pastoral functions, but that he was every Sunday presenting himself to the congregation offering to serve and was still occupying the parsonage.

Just what action the church had taken against him, he did not state, nor the reasons for it, and it is only fair to say that he was not specially inquired of concerning the causes and reasons for his relation to the congregation.

This license, called a "minister's license", was granted and issued under and in virtue of sec. 6386, of the Revised Statutes of Ohio, which reads as follows:

"Any minister of the Gospel, upon producing to the judge of the probate court of any county within this state in which he officiates, credentials of his being a regular ordained minister of any religious society or congregation, shall be entitled to receive from said court a license, authorizing him to solemnize marriages within this state, so long as he shall continue a regular minister in such society or congregation."

On the 24th day of April, 1899, Alanson Wilcox, who is a minister of the Gospel of the society, denomination, or church called Disciples of Christ, or Christian, and who is officiating as an Evangelist in the state of Ohio, under the appointment of the state missionary society, filed in this court an application, praying the court to revoke the license so granted to Mr. Reinhart. Which application, stated, in substance, that said Elmer W. Reinhart, when he so applied for said license, was not a member of the church called Disciples of Christ, and was not an ordained minister in that church or religious body.

On this application for revocation of this license, Mr. Reinhart received due notice, and on the 24th day of April, 1899, both the complainant Wilcox and Reinhart appeared in person and by counsel, and the matters of the application have been heard on the evidence.

On the hearing the court refused to permit evidence to be offered as touching the merits of the causes for the action of the Disciples' Church of Solon, in terminating the pastoral relation with Mr. Reinhart, nor did the court permit either party to go into the merits of the controversy between the church society and Mr. Reinhart. The court also refused to hear any evidence on the subject of the charges made by said church against him, or as to the truth or falsity of any charges, stories, suspicions or alleged offenses which had been made or charged against the moral character or ministerial conduct of Mr. Reinhart, growing out of his conduct before he was connected with, or employed by, the Solon church. It appeared to the court on the trial, and still appears to the court, that the question before it on this motion, does not involve the trial of Mr. Reinhart on any of the matters referred to as causes for the action of the Solon church.

Nor is the justice, wisdom or moral quality of that action to be reviewed here, or otherwise called in question, except as evidence was allowed to be given, concerning the course of procedure of the church society in withdrawing fellowship from him, and in terminating by its action, the contract of employment with Reinhart as preacher or minister.

The sole and only purpose of admitting any evidence as to the facts resulting in the severance of relation, was, if possible, to ascertain the result and effect of such action on the official and ministerial status of Mr. Reinhart in view of the statute in question. To have allowed a trial as to the foundation and merits, truth or falsity of the matters and things alleged to be offenses committed by Mr. Reinhart before coming to Ohio, and long before his union and employment with the church at Solon, would have opened up a limitless and uncertain field of inquiry, necessitating the taking of evidence at distant places, and would have caused tedious and vexatious delay and great expense, without the slightest warrant in law, as it would not have been material in any proper view to be taken of the ques-

tions legitimately before the court.

There is no claim that Mr. Reinhart has committed any breach of morals, or misconducted himself as a man or minister since his engagement at Solon.

The questions then involved in this inquiry are:

First: Was Elmer W. Reinhart ever a regular ordained minister of any religious society or congregation, officiating in Cuyahoga county or elsewhere in Ohio.

Second: If he was such regular ordained minister, does he continue, or did he continue on the 11th day of March, 1899, to be a regular minister in such society or congregation?

Whilst the discussion and determination of these questions may call for the consideration and the construction of this section 6386, and the scope, spirit, meaning, and correct application of the law to the case, yet the case does not require or justify the court in considering the moral conduct or character of the licensee any more than it does his religious soundness, or the reasonableness of his religious beliefs.

It is a question of official status, function, and character solely and simply.

This law is to receive a liberal, and not a strict construction. Marriage is exclusively a civil contract, as viewed by the state. The statutes of Ohio undertake to prescribe the conditions of civil marriage, and provide a course of procedure for parties contracting it, and designate officers who may be authorized to officiate at its celebration, and who are responsible to the state for the proper public registry of their official acts. In making these regulations, and especially in prescribing the qualification of those who may solemnize the marriage ceremony, it makes no distinction or discrimination as to any particular religious form of ordination, or religious belief, or church affiliation. In designating the class who may receive the license to solemnize marriages, the section begins with the words "Any minister of the gospel". Is this a description of exclusion or inclusion? If the sec-

tion should be strictly and technically construed, on the generally received meaning of the expression "Minister of the gospel", it would confine licensees exclusively to Christian ministers. Yet reading the whole section, and considering for a single moment, the real purpose of the law, it is clear it should not receive such a narrow construction. Such an interpretation would deny the license to the learned and reverend Jewish Rabbi, and many other ministers of religion, who, while not Christian in name, look upon marriage as a sacred and religious institution. The law here means to use the word "gospel" in its broad general sense, and keeping in view the entire act, and its manifest purpose, should be made to mean "any minister of religion". This view of the section of the statute and its meaning, is made conclusive by a glance at the preceding section, defining generally who may solemnize marriages. Section 6385 provides: "It may be lawful for any ordained minister of any religious society or congregation * * * to join together as husband and wife all persons not prohibited by law." Take the expression "any ordained minister", designating those qualified to receive the license. What do these words mean? What is the meaning of ordination? The Standard dictionary defines "ordination" as "the act or rite of admitting and setting apart to the Christian ministry or to holy orders: specially in the Roman Catholic, Anglican, and Greek churches; consecration to the ministry by the laying on of hands of a bishop or bishops; in other churches, consecration by a presbytery, synod or council of ministers."

It cannot be conceived that the use of the term "ordained minister", in the marriage laws of Ohio, has regard to any particular form of administering the rite, or any special form of ceremony. The moment an attempt is made to limit or restrict ordination to some special form or ceremony, we begin to discriminate between the diverse modes and forms of ordination practiced by the various religious so-

cieties. The laws of Ohio make no discriminations in any respect, between Catholic or Protestant, Greek, Gentile, Jewish or any other religious societies or denominations; much less do they attempt to prescribe any mode or form of ministerial ordination. It has been the practice in this court, therefore, to grant the license to authorize the solemnization of marriages, to duly commissioned officers in the Salvation Army, who are engaged under such authority in ministering in religious affairs; to all Protestant ministers, Catholic priests, Jewish Rabbis, teachers and ministers of spiritualistic philosophy, and in fact all persons, who can prove to the satisfaction of the court that they have been duly appointed, or recognized in the manner required by the regulations of their respective denominations, and are devoting themselves generally, at the work of officiating and ministering in the religious interest and affairs of such societies or bodies. I cannot conceive of any other reasonable and just construction of this statute.

Under these requirements thus liberally interpreted, it need not be asserted, that to inquire concerning the moral, spiritual, intellectual or social standing of the applicant, would be the heighth of absurdity.

We are not left without some judicial authority as to the scope and meaning of ministerial ordination. To such authority I wish briefly to advert. The case of Kibbe v. Antram, 4 Conn., 134, is a decision somewhat in point. The question was whether a marriage solemnized by a Methodist minister was valid and legal. The statute in that state provided, "That no person whatsoever in this state other than a magistrate or justice of the peace, and that within his own county or jurisdiction, or ordained minister, and that only in the county where he dwells, and during the time he continues settled in the work of the ministry, shall join any persons in marriage."

The learned chief justice in deciding the case, stated that two questions were presented. "First, was Mr. Dimick, (who performed the ceremony) an ordained minister according to this statute?" The other question has no pertinency to this case.

In dealing with the first qestion the court say: "To ordain according to the etymology and general use of the term signifies to appoint, to institute, to clothe with authority.

"When the word is applied to a clergyman, it means he has been invested with ministerial functions, or sacerdotal power. * * * Ordination properly speaking is restrained to the investure of authority; and it is entirely owing to want of due discrimination that it ever has been carried further. In a state, where the person ordained, is invested with spiritual authority, and at the same time receives the charge of a particular church and congregation, it is not wonderful, that all the rights of the clergyman, on the visible exercise of which he contemporaneously enters, should inaccurately be referred to his ordination. But in reality they are derived form different sources. His authority to preach the gospel and celebrate its ordinances, results from the ordination of the clergy; but the right to perform his ministerial functions in a particular church, depends on compact, and implies the assent of the persons over whom they are exercised. Hence, it follows that the ordination of a clergyman remains, after his separation from a church of which he once had the charge; and his spiritual authority continues, although he is not settled over a particular congregation."

Recognizing this double aspect of ordination, the learned justice found that Mr. Dimick was ordained in both senses, to-wit: with spiritual function, and was connected with, and settled over, a charge in that county, as the Connecticut statute required.

It is not difficult to see that the learned magistrate was here treating of the clergyman's ordination as understood in the polity of the Episcopalian or Anglican Church. In this respect the Methodist Episcopal Church does not differ. Hence the court cited Blackstone's Commentar-

ies as authority for his position.

Where resides the authority to ordain a minister according to the polity of the religious body known as the Disciples of Christ? Much prominence is given by the custom and practice of this religious denomination, to that minister who is called an "Evangelist". He exercises his office in the organization of church societies, and becomes the official and public func-tionary in setting churches and their officers in order. When you come to inquire after his legal authority and the scope and extent of that authority, as the ultimate source and sanction of official power conferred upon the minister at whose ordination he may officiate, the subject becomes one of some difficulty. The movement resulting in the foundation of the brotherhood known as the Disciples of Christ, was a decided revolt from the eccleciasticism into which it was conceived protestant religion had fallen; and in all organic and fundamental polity, authority was alone sought in the doctrines of the New Testament, and the authentic practice of the Apostles themselves.

In a corporate sense, the Church of the Disciples, is essentially congregational. The congregation is the unit of organization, and generally the source of corporate authority. In its government the church has discarded all councils, synods, and presbyteries. It recognizes no court of appeal or of last resort, representing, and standing for, the entire brotherhood of believers. Its church officers are generally called "Elders" or "Overseers", "Deacons" and "Evangelists" or "Ministers". In its later history, as a matter of practice. it has become the custom, to have its ministers set apart to their work, by the public ceremony of ordination, so-called. But earlier, its ministery was not in the technical sense an ordained ministry; and many of its ablest preachers and evangelists, have devoted lives of faithful service in the calling of minister, who were never ordained by any formal or public ceremony whatever. In many cases now the entire official board of a church, including elders and deacons,

are publicly ordained by the laying on of hands and prayers, and receiving charges and directions in their several duties and capacities. Whence is the authority derived to perform this office of ordination? In every case preceding their ordination it is necessary that these officers should be called and elected by the individual congregation or church society, or at most by the voluntary co-operation of two or more neighboring congregations.

It is insisted in this case that Mr. Reinhart was invested with his ministerial character by Elder W. F. Richardson of Kansas City, who was then an evangelist in the state of Missouri of the Disciples church, and by no other authority whatsoever. True, in the usual phraseology of the church, the evangelist is said to ordain the minister: As in this case, Mr. Richardson says he "ordained" Mr. Reinhart. Whence did Mr Richardson derive his authority, on his own act and will to invest one with this high and sacred function?

I do not make the inquiry in the spiritual, nor strictly religious—but in the legal sense and meaning. Without attempting any elaborate or learned exposition of the subject, I must conclude that the congregation of Disciples of Christ, being and worshiping at Norborne, Missouri, first choosing Mr. Reinhart to be their minister, and electing him to that office, called upon Mr. Richardson, as a minister, to act, as the church's agent, in conducting the ceremony of ordination. The essential authority which was transmitted, in the ordination, in the official and legal sense, emanated from the act, election, and authority, of the church. If Mr. Richardson had ordained elders and deacons for that church, they could have derived their authority, from exactly the same source, viz: the vote and election of the church, and not from the minister or evangelist who performed the ceremony of ordination. So far as it comes to be a question of corporate or legal authority, all these church officers stand on the same footing. If the power and au-

thority to ordain a minister is legally lodged in the evangelist who is called to conduct the ceremony: who lives and labors in another state, and who becomes only casually acquainted with his brother minister: and after years have elapsed, and while his brother minister is in a remote state, he having no relation or connection with him, can, of his own will, and on his own judgment, revoke his ordination, and strip him of his ministerial authority and function: the "evangelist", becomes an officer more potent and autocratic than the bishop of any hierarchy or church within my knowledge. In saying this, I am in no wise reflecting upon Mr. Richardson. It is the opinion of the court that the act of revocation sought to be exercised by Mr. Richardson, as shown in this case, was not operative to divest Reinhart of his ordination as a minister, in the meaning of the word "ordination", as used in the statutes of Ohio.

This conclusion, however, does not end this matter, nor mitigate very much, the difficulty arising from other questions in the case.

Of what import or efficacy was the action of the Disciples church of Solon, Ohio, in withdrawing fellowship from Reinhart and terminating his ministerial relation, in the purview of section 6386 of the statutes? This after all is the vital question in the case.

Mr. Reinhart became a member of the Solon congregation, by transmission of membership, originally from the church at Norborne, Missouri, on the credit of a church letter. True, his immediate transfer of membership to Solon, was through some other church. He has ceased to be a member of the congregation at Solon, and is not now, technically, a member of any congregation of the Disciples church. He is no longer officiating as a minister of the Solon congregation nor is he officiating as minister of any society or congregation in Cuyahoga county, Ohio. His suspension of the ministerial office is not voluntary, nor due to any accidental suspension of service, temporary or otherwise. In

the view I take of the duty of the court here, the court cannot review the action taken by the church at Solon, nor try the question whether its action in dealing with Mr. Reinhart as a member or minister was just, regular or strictly legal, in the last analysis. Under this statute, to entitle the regular ordained minister of any religious society or congregation to enjoy and exercise his privilege of solemnizing marriages under his license, he must officiate as such in this county, and "continue a regular minister in such society or congregation." The language here is plain and unambiguous. It is not a question as to whether a minister once ordained by the proper authority may not continue in a spiritual or professional sense, still to be a minister. I am inclined to believe that the distinction made in the Connecticut case in this regard is sound. Mr. Reinhart may be a minister de jure, and not de facto, in the light of this law. There may be a sense in which once a minister, always a minister. Such profession may continue so long as the individual has set himself apart to the noble calling, and consecrates his best powers with pure, unselfish devotion and high character, to his duties. But this statute takes a lower range of view than that. Having been ordained in the legal sense by a congregation of Disciples of Christ in Missouri, and having carried his membership and ministerial office to the church in Solon, that church, by action, not absolutely void, have revoked the membership and ministerial relation. He no longer continues to officiate as a regular minister in such society or congregation. It is a question finally of official status. It may not be necessary to find even that ordination has been revoked. It certainly is not necessary for the court to intimate the slightest opinion upon the merits of the unfortunate circumstances which lead to the action of the Solon church. In deciding this case I desire specially to avoid casting any reflections upon the conduct or moral character of Mr. Reinhart. I would not add a single iota to the em-

barrassments with which he seems to be beset. And I sincerely hope the result of this inquiry may not in the slightest degree be construed as an impeachment of his action in procuring this license, nor stand to his prejudice in any controversies growing out of his relations and service in this county. If I thought this inquiry had been invoked in a spirit, altogether censorious, I might have had less patience with its progress.

For the reasons stated the conclusion is that in the opinion of the court the license granted and issued to E. W. Reinhart, March 4, 1899, should be and is suspended, or revoked without prejudice to a future license if Mr. Reinhart should resume his regular ministerial functions hereafter.

F. B. Skeels, for Reinhart.

O. C. Pinney and G. C. Hauson, for Elder Wilcox.